## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| STEVENER GASKIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. 2:05-CV-303 |
| | ) | |
| SHARP ELECTRONICS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant Sharp Electronics Corporation's Motion to Bar Expert Testimony of Dennis Dyl and Steven Shand, filed by Defendant, Sharp Electronics Corporation, on February 1, 2007.  For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to the expert testimony of Dennis Dyl and his testimony is **BARRED**. The Motion is **DENIED** as to the expert testimony of Steven Shand, and his testimony is allowable at trial.

BACKGROUND

This case arises out of a fire that occurred the night of March 2, 2004.  Plaintiff, Mary Gaskin, rented a house in Gary, Indiana, in which her mother, Lee Ester Gaskin, also resided.  Lee Ester Gaskin was killed in the fire.  Plaintiffs claim that a 19-

inch Sharp television, Model 19 RM 100, caught fire in Lee Ester Gaskin's bedroom, and caused her death.  Plaintiffs filed their complaint against Defendant, Sharp Electronics Corporation ("Sharp") on May 18, 2005, alleging that Sharp is strictly liable for designing, manufacturing, and placing into the stream of commerce the Sharp television in an unreasonably dangerous and/or defective condition so as to cause the fire (Compl. ¶ 10), and that Sharp was negligent in the design, manufacture, and marketing of the television.  (Compl. ¶ 11.)  On the same date that Sharp filed a motion for summary judgment, it filed the present motion to bar the testimony of two experts retained by Plaintiffs - Steven Shand and Dennis Dyl.  This Court held hearings on the motion to bar testimony on April 25, 2007 and June 12, 2007.  At those hearings, the following individuals testified: Steven Shand, Dennis Dyl, and Sharp's retained expert, Lawrence Sacco.  The parties submitted memoranda to this Court before the hearing and supplemental memoranda after the hearing.  As such, this motion is ripe for adjudication.

Steven Shand was retained by Plaintiffs to give an opinion on the cause and origin of the fire.  Originally, Shand investigated the fire at issue on behalf of the State Farm Insurance Company, at the request of the property owner.  Shand is a certified fire investigator and a certified fire and explosion investigator.  He is the co-owner of Shand Forensic Investigations, Inc., and has

investigated between 3,000 and 3,5000 fires during his career. (April 25, 2007 Hearing Tr., p. 18.)

Shand reached the following summary in his cause and origin analysis:

> Based on the burn pattern analysis, the degree of destruction, and the evidence examined, it is our opinion that the fire originated to the north of a television stand located adjacent to the east wall in the northwest corner bedroom. Fixed branch circuit wiring within the room was examined and eliminated as the cause of the fire. Because of alterations to the scene and the inability to examine all evidence removed from the scene, a definitive cause could not be determined.

(Shand's Report, p. 4.)  Sharp attacks Shand on the basis that his opinion is not reliable, and that it is confusing (because Shand opines the fire began to the North of the television stand), and cannot aid the jury in determining the cause of the fire.

Dennis Dyl is an electrical engineer retained by Plaintiffs. By way of background, Dyl has a masters of science in electrical engineering and is a licensed professional engineer and a certified fire investigator.  Dyl has worked in the field of electrical engineering since 1972.  Dyl reached the following conclusions and opinions in this case:

> 1.   The fire damaging the Gaskin residence originated in the northwest bedroom occupied by Mrs. Lee Ester Gaskin.
>
> 2.   The electrical system within the bedroom did not contribute to the fire ignition.
>
> 3.   No electrical devices or appliances other than the Sharp 19R-M100 Color Television were

3

located in the room.

4.    The Sharp Color Television was plugged into an
energized receptacle on the east bedroom wall.

5.    The Sharp Television was heavily fire damaged.
The polymer cabinet had been consumed.  The
remains of the picture tube have rotated to
the   rear,   indicating   loss   of   material
initially at the top and rear of the cabinet.
The back of the tube, connector, and picture
tube circuit board were severely damaged, more
than the main circuit board.  The television
has failed internally at a location near the
back of the picture tube.  The failure ignited
the polymer cabinet and nearby combustibles.

(Dyl Report, p. 3.)   Additionally, during his deposition, Dyl

opined that a poor connection between a pin and the CRT board

increased electrical resistance, which created heat and caused the

fire.  (Dyl Dep., pp. 43, 77.)

In  preparing  these  conclusions,  Dyl  reviewed  the  following

materials:

1.    Examination of the remains of the Sharp Model
19R-M100

2.    Review of the Operation Manual for the Sharp
Model 19R-M100 Color Television

3.    Review  of  the  Service  Manual  for  the  Model
19R-M100

4.    A  review  of  the  Consumer  Product  Safety
Commission (CPSC) Recall Database

5.    110 Fire Scene photographs

6.    38 color copies of the fire scene photographs

7.    Sharp    Electronics    Corporation    initial
disclosures

4

8.    X-Rays of the remains of the subject Sharp
      Model 19R-M100

9.    City of Gary Fire Department Report 04-3-990

10.   Shand Forensic Investigative Report SF#04-740

11.   NFPA 921.

(Dyl Report, p. 1.)  Additionally, Dyl relied upon an Internet article that theorizes that sufficiently preheated UL 94 rated plastics can spread flames, but the article also notes there is "nowhere near enough research to comfortably quantify this phenomenon."  (Dr. Vytenis Babrauskas, Ignition of Plastics from Electrical Faults (2001), http://www.doctorfire.com/electric-fire.html, hereinafter "Babrauskas article".)

Sharp argues that Dyl's opinions are unreliable because they are not based upon sufficient facts or data.  Sharp relies heavily upon the fact that Dyl did not test the television at issue in this case.  Plus, Dyl did not test an exemplar television, and he did not visit the fire scene.  Additionally, Sharp argues that Dyl's testimony cannot aid the jury.

Finally, Sharp moves to exclude the testimony of Dyl and Shand as a sanction for spoliation of evidence.  It is undisputed that Plaintiff, Stevener Gaskin, removed the television remains from the scene the day after the fire.  Plaintiffs claim the fire department advised Gaskin to remove the television.  By the time Sharp received the complaint in this action and had the opportunity to

5

inspect the television remains at the office of Plaintiffs' attorney on September 12, 2005, Sharp contends the television fuse had been lost and/or destroyed.  Sharp argues it was severely prejudiced by being denied a full opportunity to investigate the fire scene and the television at issue.

DISCUSSION

Daubert Analysis

Federal Rule of Evidence 702, which governs expert testimony, provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702.  In addition, in *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court fashioned a two-prong test of admissibility for evidence based on the "scientific knowledge" mentioned in Rule 702.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).  To be admissible, evidence must be both relevant and reliable.  *Id.* at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting the objective of court's gatekeeping requirement is to ensure reliability and

6

relevancy of expert testimony); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (finding *Daubert* requires the court to ensure expert testimony is both reliable and relevant).

Under the reliability prong, scientific evidence must be reliable in the sense that the expert's testimony must present genuine scientific knowledge. *Daubert*, 509 U.S. at 592-93; *Smith*, 215 F.3d at 718; *Deimer v. Cincinnati Sub-Zero Prods. Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). Generally, the expert witness must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the witness's field. *Kumho*, 526 U.S. at 152. Specifically, a court may, but is not required to, consider a nonexclusive list of four factors in assessing reliability: (1) whether the expert's theories and techniques can be verified by the scientific method through testing; (2) whether the theories and techniques have been subjected to peer review and publication; (3) whether the theories and techniques have been evaluated for their potential rate of error; and (4) whether the theories and techniques have been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Deimer*, 58 F.3d at 344. Other factors a court may consider include: (1) whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinions expressly for the purposes

7

of testifying; (2) whether the expert formed his opinion and then looked for reasons to support it rather than research that led him to his conclusion; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for obvious alternative explanations; (5) whether the expert is being as careful as he would be in his professional work outside his paid litigation consulting; and (6) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See Kumho*, 526 U.S. at 151; *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535-36 (7th Cir. 2005); Fed. R. Evid. 702 Advisory Committee's note (2000 amends.).

The test is a flexible one tied to the facts of a particular case and no single factor is either required or dispositive to its outcome. *Daubert*, 509 U.S. at 594-95. Furthermore, in assessing reliability, the trial judge should keep in mind that he or she functions as a gatekeeper of admissibility, and does not take on the jury's role of assessing the weight that testimony deserves. A court focuses on the expert's principles and methodology, not on the conclusions that they generate. *Id.* at 595; *Smith*, 214 F.3d at 718.

Under the relevance prong, the testimony must assist the trier of fact to understand the evidence in the sense that it is relevant to or "fits" the facts of the case. *Daubert*, 509 U.S. at

591; *Smith*, 215 F.3d at 718.  In other words, the testimony must be such that the jury can apply it in a meaningful way to the facts at hand.  This "fit" analysis essentially represents an inquiry similar to if not indistinguishable from the basic evidentiary inquiries into whether evidence is relevant and, if so, whether its probative value is nonetheless substantially outweighed by, among others, the danger of unfair prejudice and jury confusion.  *See Daubert*, 509 U.S. at 595; *Ayers v. Robinson*, 887 F. Supp. 1049, 1058-59 (N.D. Ill. 1995).  Plaintiffs, as the proponents of Dyl and Shand's testimony, bear the burden of establishing its admissibility by a preponderance of proof. *Muzzey v. Kerr-McGee Chemical Corp.*, 921 F. Supp. 511, 518 (N.D. Ill. 1996).

The Court notes that Plaintiffs argue that Indiana substantive law allows a plaintiff to prove a defect using one of four methods mentioned in the *Ford Motor Co. v. Reed*, 689 N.E.2d 751 (Ind. Ct. App. 1997), and *Whitted v. General Motors Corp.*, 58 F.3d 1200 (7th Cir. 1995) cases, including inferential or circumstantial evidence.  Plaintiffs therefore suggest that Dyl need not testify that a defect occurred in the subject television under definite parameters.  Indiana product liability substantive law is irrelevant to the current *Daubert* analysis this Court must undertake as to the reliability and relevancy of the actual expert opinions proffered by Dyl and Shand.  Regardless of what Indiana

9

substantive law might require to prove a products liability case, this Court must analyze the actual opinions proffered by Plaintiffs' experts and make sure they comport with the requirements of *Daubert*.   It is well established that the admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*.   *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 32006) (noting that the Seventh Circuit undertakes "a *de novo* review of whether or not the district court properly followed the framework set forth in *Daubert*.").   While Indiana law may govern the ultimate issue of liability in this case, Indiana law does not affect procedural aspects such as the admissibility of expert testimony, which is clearly governed by the *Daubert* framework.   Plaintiffs argue that *Fuesting* is a case in which the Seventh Circuit used Illinois products liability law to provide the relevant framework to guide the *Daubert* opinion. However, Plaintiffs are mistaken.   421 F.3d at 532-33.   Although the *Fuesting* Court did summarize Illinois products liability law, it then turned toward the proffered expert testimony, which constituted the merits of the appeal.   *Fuesting*, 421 F.3d at 532, 534.   In addressing the denial of a pre-trial motion to exclude expert testimony, the Court recognized that the admissibility of scientific expert testimony is governed by Federal Rule of Evidence 702, and in particular, *Daubert*.   *Id.* at 534.   The Seventh Circuit in *Fuesting* did not consider state substantive law

10

in its analysis of the propriety of expert testimony, and neither will this Court.

Shand

Shand's qualifications are not at issue in this case. However, qualifications alone do not suffice. "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). Sharp argues that Shand's opinion that the fire originated just North of the television stand is unreliable because it was not tested, Shand did not properly analyze the burn patterns, and he failed to eliminate other potential causes. Sharp also attacks Shand's testimony as not relevant, arguing it will not help the jury because it is inconsistent and does not aid the jury in determining a cause of the fire.

This Court finds that Shand's opinion is reliable. Shand testified about the method of fire investigation that he trained in which comports with the National Fire Protection Association ("NFPA") standards and procedures. Shand follows this same method during every investigation he has conducted during his lengthy career, and he used the method in this case. (April 25, 2007

11

Hearing Tr., pp. 19-27, 57.)  Shand collected data by visiting the house three days after the fire,[1] taking photographs, and conducting an on-site investigation by moving through the house from the area of least amount of fire damage to the most amount of damage.  (*Id.*, p. 23.)  In using this method, Shand was able to pinpoint the cause of origin of the fire to the northwest bedroom (a conclusion that Sharp does not seem to dispute).  Once inside the bedroom, Shand analyzed fire movement, the lowest level of the fire, and burn patterns, noting a "V pattern" on the wall extending upward and outward from the entertainment center. (*Id.*, pp. 29-39; *see* Ex. 4)  This burn pattern is clearly visible in the photographs taken by Shand.  (*Id.*)  It is important to note that Sharp does not suggest that Shand's overall methodology is improper, or that his general analysis of burn patterns and V patterns is not a scientifically valid and well accepted method. Nor does Sharp contest the methodology of fire cause and origin investigation set forth by the NFPA.

Sharp criticizes Shand for not thoroughly considering and eliminating other possible causes of the fire.  However, Shand testified that, among other causes, he considered and eliminated

---

[1] Sharp contends that Shand's testimony should be barred because the scene had been altered by the time Shand arrived. Sharp cites to no authority in support of this proposition. Shand arrived at the property promptly, and this Court believes that the scene was sufficiently intact for Shand to conduct his customary cause and origin analysis and for Shand to comport with the proper methodology.

the 2 electrical outlets in the bedroom, the wall light switch, the electrical wiring in the wall, and the over head light. (April 25, 2007 Hearing Tr., pp. 45-46, 64-65.)  Additionally, Shand observed environmental burn pattens and even burning on the head board to conclude that the fire was not caused by a smoldering fire that had started on the bed.  (Shand Dep., p. 184.)  Shand also eliminated the closet, reasoning that he could "tell with the door being in the closed position that the fire started in the northwest corner bedroom and moved into the closet."  (Shand Dep., p. 100.)  This Court believes that in reaching his opinion, Shand "adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 Advisory Committee's note (2000 amends.).  Sharp also criticizes Shand for not considering the "flashover" phenomenon, when flames can engulf an entire room, destroying original burn patterns, but Shand testified before this Court that no flashover occurred in this case, which was evident from the burn patterns and lack of consistent patterns in the room. (April 25, 2007 Hearing Tr., p. 65.)

Along the same lines, Sharp argues that "Shand's methodology is fatally devoid of testing and analysis." (Def. Sharp's Mot. To Bar Expert Testimony, pp. 13-14.)  The mere fact that no testing was done is not an automatic bar to the admissibility of an expert's opinion.  The Seventh Circuit has stated that while

testing is often important, particularly in alternative design cases, hands-on testing is not "an absolute prerequisite to the admissibility of expert testimony." *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). In this case, the Court is unsure what type of physical testing, if any, Shand, a cause and origin expert, could have conducted. Determining the general origin of a fire, as Shand has done, is not susceptible to testing, and yet, it does constitute generally accepted practice as a method for fire investigators to analyze the origin of a fire. The key inquiry is, whether testing is done or not, whether the expert is testifying with the "same standards of intellectual rigor that are demanded in their professional work." *Id.* Shand testified that the method he followed in determining the cause of the fire should be used by every fire investigator, regardless of whether litigation may be involved. (April 25, 2007 Hearing Tr., p. 24.) This Court believes that Shand's opinion in this case is consistent with the level of intellectual rigor demanded in his professional work.

In addressing the second prong of *Daubert*, Sharp urges that Shand's testimony is not relevant because it is inconsistent and does not aid the jury in determining a cause of the fire. Shand's opinion is that the fire started just North of the entertainment center, and that "a definitive cause could not be determined." (Shand's Report, p. 4.) Thus, he has no opinion as to whether the

14

television started the fire, and Shand admitted that he was not qualified to make such a conclusion because he does not understand television sets. (Shand Dep., pp. 207-08.)  Sharp believes Shand's testimony is inconsistent with Dyl's conclusion that the television started the fire, and that the testimony would confuse the jury.  The Court disagrees.  Shand testified that the burn patterns are consistent with a theory that the television started the fire, and that the entertainment center was within the area of fire origin.  (April 25, 2007 Hearing Tr., pp. 58, 62-63.) Although Shand identified the lowest level of the fire to be just North of the television stand, this could be the result of two different phenomena: (1) a fuel package could have been ignited by the fire that occurred on the wall; or (2) there could have been drop down burning, where something on the television stand fell off and started a secondary fire.  (*Id.* at 59-61; *see also* Shand Dep., p. 144.)  Thus, Shand's testimony showing a lower fire is not inconsistent with the fire starting at the television. Shand's opinion that the fire started just to the North of the entertainment center is relevant because it would assist the jury in determining that the television caused the fire.


<u>Dyl</u>

Sharp does not directly challenge Dyl's qualifications to testify as an expert in this case.  Rather, it disputes the

15

adequacy of his conclusion that the television set caused the fire. Whether Dyl's testimony passes the muster of *Daubert* is a much closer call than the clearly relevant and reliable testimony of Shand.

Sharp contends that Dyl's opinions do not meet the first prong of the *Daubert* test. Under the *Daubert* standard set forth above, the first inquiry that must be undertaken is whether Dyl relied upon a proper scientific methodology to determine the cause of the fire. "The first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method." *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994). While testing is often very important, it is not "an absolute prerequisite to the admissibility of expert testimony." *Allstate Ins. Co. v. Maytag* Corp., No. 98 C 1462, 1999 WL 203349, at *4 (N.D. Ill. Mar. 30, 1999) (citing *Cummins*, 93 F.3d at 369). Either "hands-on testing" or "review of experimental, statistical, or other scientific data generated by others in the field" may suffice as a reasonable methodology upon which to base an opinion. *Cummins*, 93 F.3d at 369.

It is undisputed that Dyl conducted no physical tests on the television remains (which were largely destroyed by the fire) or any exemplar television. Dyl did not visit the scene of the fire, and he has never seen the connector pins he claims are at fault, because the pins were consumed in the fire. (Dyl Dep., p. 41,

16

82.)  Dyl admits that he conducted no physical scientific tests or experiments to verify his hypothesis.  (Dyl Dep., pp. 19, 113.) During his deposition, Dyl was questioned, and gave the following answers on this subject:

> Q.   By the way, have you done any testing in this case at all?
>
> A.   No.
>
> Q.   On an exemplar or any other type of testing?
>
> A.   Not if I couldn't obtain an exemplar.
>
> Q.   Well, you haven't done any testing of any sort in this case, is that right?
>
> A.   That is correct, because I couldn't obtain an exemplar TV.
>
> Q.   So November 3, 2005 you spent a total of half an hour looking for internet recalls and exemplar, is that right?
>
> A.   That's correct.

(Dyl's Dep., p. 19.)  The Court notes that in contrast, Sharp's expert, Lawrence Sacco, presented testimony at the *Daubert* hearing regarding Sacco's testing of an exemplar Sharp television set and his findings that, even when heated with a blowtorch, the CRT board was incapable of spreading fire, and so was the flame retardant plastic cabinet on the television.  Rather, Sacco determined that any fire would have self-extinguished.  Of course, this Court judges Dyl separately from any other expert, but it is noteworthy that physical testing could have been conducted, and in

17

fact was conducted, by another expert in the case.

Plaintiffs claim Dyl has satisfactorily "tested" his scientific theory by using "deductive reasoning," pointing to the NFPA guide which states that "testing of the hypothesis may be either cognitive or experimental." (NFPA 921, p. 921-14.) While the NFPA is a recognized guide in the investigation of causes of fires and explosions, this Court does not believe its general recitation of the scientific method necessarily excuses Dyl's lack of experimental testing in this case considering Dyl's very specific proffered opinion that "[t]he television has failed internally at a location near the back of the picture tube. The failure ignited the polymer cabinet and nearby combustibles." (Dyl Report, p. 3.) Dyl also opines that "the failure causing the fire was in the CRT board innerfaced [stet.] to the CRT, the pin connections." (Dyl's Dep., p. 77.)[2] This very specific, detailed

_____

[2] The Court has quoted Dyl's opinion word for word from his report and deposition. There seems to be some confusion among the parties as to what exactly is Dyl's opinion. For example, Plaintiffs repeatedly contend that Sharp has misstated Dyl's opinion. (Reply to Sharp's Post-Evidentiary Hearing Mot. to Bar Expert Testimony of Dennis Dyl and Steven Shand, p. 2.) In their reply brief, Plaintiffs claim that "Dyl's opinion is that a high resistance or loose pin connection created heat that ignited nearby combustibles. It is not necessary for the polymer cabinet itself to sustain fire without a heat source." (*Id.*, pp. 2-3.) Although the Court is by no means an expert in the field of science, this last statement by counsel seems potentially contradictory to Dyl's stated opinion that "[t]he failure ignited the polymer cabinet." (Dyl Report, p. 3.) Therefore, whenever possible, this Court quotes Dyl's opinions directly from his report and testimony, rather than relying upon counsel's characterizations of Dyl's opinions.

opinion is quite different than Shand's general conclusion that the fire started in the vicinity of the entertainment center (an opinion based upon Shand's inspection of the scene and analysis of burn patterns, but one not really susceptible to physical testing).

Plaintiffs contend that Dyl followed the scientific method because he analyzed and collected data, he reviewed the deposition testimony of Mary Gaskin (who testified that she saw flames coming out of the television set), he looked at the remains of the television set and made measurements of the same, and he was "very suspicious at this point that the fire was originating in the TV." (April 25, 2007 Hearing Tr., p. 100.)  Plaintiffs argue that Dyl "develop[ed] this hypothesis" (Pl.'s Resp. To Def. Sharp Electronics Corporation's Mot. To Bar Expert Testimony of Dennis Dyl and Steve Shand, p. 7), by examining x-rays of the subject television.  According to Dyl, his examination of the x-rays revealed "distress," which Dyl defined as "areas where the components are displaced, the components are melted, the soldered joints are melted and resolidified giving them a very globular appearance."  (April 25, 2007 Hearing Tr., pp. 104-05.) Plaintiffs argue Dyl then tested his hypothesis by using deductive reasoning.  Specifically, they claim that Dyl eliminated other causes of the fire within the television itself including the transistor, resistors, and capacitor.  (Dyl Dep., pp. 104-05.)

Dyl also considered a recall of a different model Sharp television set. However, as Sharp points out, nowhere in the recall is there any language to suggest that the television can ignite.[3] Instead, the recall states "[p]ower button can break allowing objects to be inserted through the opening. Foreign materials such as crayons, metal objects or straws can ignite posing a fire hazard." (Recall, Ex. 5 to Dyl's Dep.) There is no evidence in this case that anything was inserted through a hole into the television set. Finally, Plaintiffs believe there was no need for Dyl to research the generally accepted premise that a poor connection can cause heat.

Although Dyl did perform some deductive reasoning to support his hypothesis in this case, this Court is troubled that Dyl did not conduct any scientific tests or experiments to bolster his theory that a poor connection between a pin and the CRT board increased electrical resistance, which created heat, caused the fire, and ignited the polymer cabinet and nearby combustibles. Rather than relying upon specific tests, experiments, or studies, Dyl has attempted to rely on "common and basic principles."

---

[3] In his deposition on August 28, 2006, Dyl himself said the recall was not relevant to this case: "Q: Mr. Dyl, Exhibit 5 is two pages that you pulled from the internet on November 3, 2005 concerning a recall of an [stet.] Sharp conventional tube television, is that correct? A: Yes. Q: And you did not think that was relevant to this case, is that right? A: That's correct. Q: And you did not use that recall information in Exhibit No. 5 as the basis of any of your opinions in this case, is that correct? A: That's correct." (Dyl Dep., p. 17.)

(Pl.'s Resp. To Def. Sharp Electronics Corporation's Mot. To Bar Expert Testimony of Dennis Dyl and Steven Shand, p. 9 n.5.)   An "indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion." *Fuesting*, 421 F.3d at 536 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657-58 (7th Cir. 1998) (holding that a "bare conclusion" offered without explanation or empirical support fails the reliability requirement of Rule 702); Fed. R. Evid. 702 Advisory Committee's note (2000 amends.) (listing "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" as a relevant factor in determining reliability of expert testimony)).   The Court believes that the main problem here is that Dyl did not bridge the analytical gap between the basic principle that a poor connection can cause heat, and his very complex conclusions about how this specific fire started in this specific Sharp television.   For example, Dyl never tested a pin connector to try to create electrical resistance, he never tried to create heat with the power available in the subject television, he never tried to ignite the allegedly self-extinguishing polymer cabinet, and he never tried to ignite anything whatsoever in the subject television.   As a result, the Court is left with

unanswered questions such as: can a loose pin connection in the subject television create enough heat to cause a fire? Was enough energy provided to the television through the cord to generate enough heat to cause such a fire? What was the maximum amount of heat energy that may have been present at a high resistance pin connection on the CRT board? Even if a fire did start at the CRT board in the subject television, would it be extinguished by the protective polymer cabinet? Can the polymer cabinet burn, or propagate a flame, or what type of properties would it exhibit if subjected to heat and/or a flame? As the Seventh Circuit stated in *Fuesting*, "[s]ome greater methodology is required to bridge the analytical gap between general principles and particular conclusions, and to vest thereby the opinion with requisite reliability." *Fuesting*, 421 F.3d at 536.

The second and fourth *Daubert* factors consider whether the theory has been subjected to peer review and gained general acceptance in the relevant community. Dyl's theory in this case that a poor connection between a pin and the CRT board increased electrical resistance, which created heat and caused the fire, and the "failure ignited the polymer cabinet and nearby combustibles" (Dyl Report, p. 3; Dyl Dep., pp. 43, 77), has not been published or otherwise subjected to peer review, and Plaintiffs have put forth no evidence that his theory has gained general acceptance in the scientific community. Dyl concedes that he has never

documented anything concerning the ignition of plastics from electric faults. (Dyl Dep., p. 50.) However, Dyl claims that his theory is supported by the 2-paragraph Babrauskas article that appeared on the Internet. The Babrauskas article states that sufficiently preheated UL 94 rated plastics can spread flames in at least two electrical fault categories, noting that "[p]robably other fault modes also exist that can lead to the same outcome, but these two have received at least some scientific study (although nowhere near enough!)." (Babrauskas Article.) The two electrical fault categories described by Babrauskas are: (1) "a poor connection, for example, at a screw terminal of an outlet or at a place where a wire is crimped onto the prong of a male plug"; and (2) "broken wires in a flexible cord." (*Id.*) Dyl concedes that in this case, there was no broken wire in a flexible cord, and no poor connection at a screw terminal of an outlet. (Daubert Hearing, p. 142.) However, Dyl argues that even though there is no place where a wire is crimped onto the prong of a male plug, a pin and barrel connection at the back of the CRT board is similar to a plug blade in a receptacle. *Id.* Dr. Babrauskas goes on to state that "[t]here is nowhere near enough research to comfortably quantify this phenomenon, but at least sufficient research exists so that the basic concepts are validated," and then cites to four studies. (Babrauskas Article.) Dyl is unaware whether the Internet article has been published anywhere or peer reviewed.

(*Id.* at p. 141.)  Finally, Dyl admits that he is not aware of any other scientific studies other than the Babrauskas article relating to the cause of the fire in this case. (Dyl Dep., pp. 45-46.)  This Court does not believe this two-paragraph article, of which Plaintiffs have only shown exists on the Internet, sufficiently constitutes peer review or general acceptance from the scientific community.  First and foremost, Dr. Babrauskas himself notes that this concept needs more research.  Second, although one category detailed in the article is arguably analogous to this case, nowhere does the article directly touch upon the conditions present at a pin connection at a CRT board in a television.  Third, there is no evidence that anyone else in the scientific community has reviewed, much less accepted, Dr. Babrauskas' theory.  And finally, Dr. Babrauskas' comment that "[t]here is nowhere near enough research to comfortably quantify this phenomenon" exposes the main flaw in Dyl's opinion, which this Court has already pointed out: Dyl has failed to bridge the analytical gap between general principles and particular conclusions that can be made from the television in this case.

Plaintiffs' argument that the opinions and research conducted by Sharp's retained experts in this case somehow qualifies as a peer review of Dyl's opinions is untenable.  Sharp states that "[a]t most, the only portion of Dyl's hypothesis that Sharp's experts agree with is the possibility that a loose connection can,

under certain specific circumstances, cause heat." (Def. Sharp Electronics Corporation's Post Evidentiary Hearing Resp. to Pl.'s Resp. To Def.'s Mot. To Bar Expert Testimony of Dennis Dyl and Steven Shand, filed on August 3, 2007, p. 5.) But this does not mean that Sharp's experts have ratified Dyl's opinion in this case. To the contrary, Sharp argues that "the testing completed by Sharp's expert Larry Sacco directly disproves Dyl's hypothesis." (*Id.*, p. 5.)

Dyl's proffered opinions also fail to satisfy other factors set forth by the Advisory Committee in the notes for Rule 702. As set forth earlier, this Court believes that Dyl has unjustifiably extrapolated from an accepted premise (that a faulty connection can cause heat) to an unfounded conclusion (that a poor connection between a pin and the CRT board in the subject television generated heat, caused a fire, which ignited the polymer cabinet and nearby combustibles). There is no question that Dyl has developed his opinions expressly for the purpose of testifying rather than testifying about matters growing naturally and directly out of research he has conducted independent of this litigation. Moreover, Dyl's description of forming a "hypothesis" and then looking for support is less reliable than conducting research that leads to a conclusion. Although Dyl claims to have accounted for other obvious alternative explanations, he admits that transistors, resistors, capacitors, pin connectors, diodes,

25

and solder connections are all possible heat sources in the television, but believes that the pin connector is the most probable cause.  (Dyl Dep., pp. 105-06.)

In sum, this Court finds that Dyl's testimony does not satisfy the first prong of *Daubert*, reliability.  Accordingly, the Court need not examine *Daubert*'s second prong to determine that Sharp's motion should be granted as to Dyl.


<u>Spoliation Analysis</u>

As an alternate theory to disqualifying Shand and Dyl's testimony under *Daubert*, Sharp also argues that their expert testimony should be barred as a sanction for Plaintiff's spoliation of the fire scene and television fire remains. Plaintiff admits that they removed the television remains from the scene the day after the fire.  Stevener Gaskin testified during his deposition that he was told by a fire investigator to remove the television, and that he placed it in an empty box and put it in his garage.  (Gaskin Dep., pp. 114-16.)  The first time Sharp was put on notice of the incident at issue was when the complaint was served upon them, after the fire scene was completely destroyed.  Sharp argues that it was prejudiced by this failure to promptly notify it because its retained experts were not able to inspect the fire scene and/or analyze the television remains in its pristine state because by the time Sharp was able to analyze

the television, the fuse was lost or destroyed.

Indiana recognizes spoliation as "the intentional destruction, mutilation, alteration, or concealment of evidence, usually a document.  If proved, spoliation may be used to establish that the evidence was unfavorable to the party responsible." *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000) (citation omitted).  Moreover, the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it.  *Id.* (citing *Porter v. Irvin's Interstate Brick & Block Co.*, 691 N.E.2d 1363, 364-65 (Ind. Ct. App. 1998)).  In this case, Sharp has put forth no evidence that Plaintiff intended to destroy the television set or fire scene, intended to suppress evidence, or intentionally lost or removed the fuse.  "Mere ownership of potential evidence, even with knowledge of its relevance to litigation, does not suffice to establish a duty to maintain such evidence." *Glotzbach v. Froman*, 854 N.E.2d 337, 341 (Ind. 2006) (citation omitted).  Consequently, the motion to bar based on spoliation of evidence is denied.


CONCLUSION

For the reasons set forth above, the motion is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to the expert

27

testimony of Dennis Dyl and his testimony is **BARRED**.   The Motion

is **DENIED** as to the expert testimony of Steven Shand, and his

testimony is allowable at trial.


DATED:  August 31, 2007                    /s/RUDY LOZANO, Judge
                                           United States District Court